# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

TONGA NOLA, ET AL

VERSUS

EXXON MOBIL CORPORATION, ET AL

CIVIL ACTION

NO. 13-439-JJB

## RULING ON MOTION TO CERTIFY CLASS

This case is before the Court on a Motion to Certify Class (Doc. 124) brought by the plaintiffs. The defendants filed an opposition (Doc. 130), and on February 4–5, 2015, the Court held a hearing on the matter. Afterward, the parties submitted post-hearing briefs (Docs. 154, 155). Further oral argument is unnecessary.

## Background

The plaintiffs are a group of individuals who live near the Exxon refinery plant near the Mississippi River and Scenic Highway in Baton Rouge, Louisiana. They filed suit against Exxon Mobil Corporation (Exxon) and several associated entities; Exxon removed the case to this Court in July of 2013. In their petition, the plaintiffs allege that the refinery repeatedly failed to meet regulatory standards, resulting in numerous leaks—roughly 145—of chemicals such as, hydrogen sulfide, and they also complain about three specific incidents: a naptha leak on June 14, 2012; an HCI[1] release on November 20, 2012; and, finally, a sulfur dioxide leak on May 23, 2012. These incidents, according to the plaintiffs, caused many physical issues and problems associated with nuisance. Their complaints included, among others, sinus irritation, post-nasal drip, odors, and persistent cough. In November of 2014, the plaintiffs filed a motion to certify class, and the Court held on a hearing on that motion on February 4–5, 2015.

---

[1] This refers to hydrochloric acid.

I. Proposed Class Representatives

The plaintiffs' proposed class is defined as all individuals living within a certain geographic area near the refinery from June 2012 to the present, though not all proposed class representatives lived in this area for the entire time period. Before the hearing, the plaintiffs moved to remove Tonga Nolan and her minor children as class representatives, and the Court granted that motion. The remaining class representatives include residents who assert several, if not all, of the complaint's grievances—odors, cough, sinus irritation, and lack of enjoyment of their property, for example. These proposed representatives have lived in the area for varying amounts of time, from decades to a few short months; several no longer live there but did during at least a portion of the identified time period. The proposed representatives who testified at the hearing all indicated that they were willing and able to participate in the litigation.

A. Representatives Absent from the Hearing

The first proposed representative, Lawrence J. Alexander (Alexander), lives at 2848 Jessamine Avenue in Baton Rouge, which is within the defined geographic area proposed by the plaintiffs. He has lived in his home for over twenty-five years, so the entirety of the class definition period, and complains of rashes, eye irritation, asthma, headaches, respiratory problems, fatigue, and memory issues. At the certification hearing, he did not testify.

Flora Dupree (Dupree) also did not testify at certification hearing. She lived at 2723 Arbutus Avenue in Baton Rouge, within the proposed class area, from before June 2012[2] until some point in 2013. Her symptoms included nausea, diarrhea, vomiting, burning eyes, and dizziness. Dupree also complained of the odor, indicating that it frequently overwhelmed her and forced her inside.

---

[2] This date is significant as it is the beginning of the timeframe used in the class definition period.

B. Representatives at the Hearing

Mary and Preston George (The Georges), the next proposed class representatives, did testify at the hearing. They live at 2683 Linwood Drive in Baton Rouge, within the proposed class area, and they have lived there for the entire class definition period. Mrs. George testified that she experienced burning in her eyes, watery eyes, a cough, bronchitis, and sinus issues. She also indicated that she avoided spending too much time outside due to odors. Mr. George complained of similar health issues, though he also testified that he suffered a major vascular infection in 2013. Like his wife, Mr. George indicated that he limited his time outdoors. Further, on cross examination, Mr. George claimed that he believed the leaks and emissions from the Exxon refinery were at least partially responsible for the multiple roof replacements that his home required.

The next proposed class representative, Gussie Johnson (Johnson), has lived for over three years, so the entirety of the class definition period, at 1501 Seneca Street in Baton Rouge, which is within the proposed class area. She testified at the hearing and complained of headaches, rashes, sinus issues, and being far more fatigued at home than away from home. On cross, she admitted to being a regular smoker for years until recently quitting, though she maintained that her symptoms appeared after moving to her current home. Her children and fiancé, she claimed, suffered similar symptoms. Johnson also complained about the odor, identifying it as rotten and persistent, and indicated that it made her uncomfortable having guests and hosting social events.

Keisha Smith (Smith), the last representative to testify at the hearing, lived at 2621 Lupine Avenue in Baton Rouge, within the proposed class area, from February 2013 to May 2013—not the entire class definition period. She, and her children, according to her testimony,

suffered a decreased quality of life due to the odors—which prevented them from enjoying the home—and physical symptoms, which included sinus issues, watery eyes, and headaches. Ultimately, Smith broke her lease early and moved away due to her symptoms.

II.     Proposed Class

The proposed class is defined as those who lived within a defined geographic area from June 2012 to the present. According to the plaintiffs' experts, all individuals within this area were exposed to sufficient levels of particulate matter and hydrogen sulfide to cause noticeable effects, and they all were exposed to sufficient amounts of naptha, HCl, and sulfur dioxide[3] to suffer effects. At the hearing, the plaintiffs' experts—Dr. William Sawyer (Dr. Sawyer) and Mr. William Auberle (Mr. Auberle)—focused on hydrogen sulfide, and they asserted that they compared models of exposure to a particular study indicating at what level exposure to hydrogen sulfide could produce effects for most individuals, also known as its "odor threshold." Further, according to Mr. Auberle, the modeling data accounted for other factors, such as terrain and atmospheric conditions—though he did acknowledge that he did not account for other possible sources of the chemicals, he still claimed that least 80% came from Exxon—ensuring a more precise measurement when evaluating the class area.  These exposure levels, according to the plaintiffs, are also sufficient to invoke nuisance issues, such as offensive odors, within the area outlined. Although the measurements were for a twenty-four hour period of "theoretical" exposure that would not be uniform within the area, the plaintiffs' experts maintained the effects, across the board, would exist; they might be more intense in certain areas, but that would be addressed by the plaintiff's proposed bifurcated trial.[4]

---

[3] It should be noted that not all representatives—so presumably not all proposed class members—were residents at the time of all three major leaks.

[4] This is addressed more thoroughly in section III.

At the hearing, the defense experts challenged the findings and opinions of the plaintiffs' experts. Mr. Gale Hoffnagle (Mr. Hoffnagle), the first defense expert, testified that the odor threshold[5] of hydrogen sulfide varies widely among individuals, and he also noted that the Louisiana Department of Environmental Quality (DEQ) air monitors showed lower concentrations in the area generally than those suggested by the plaintiffs. Their other expert, Dr. John Kind (Dr. Kind), testified that the isopleths chosen by the plaintiffs' experts were inappropriate, as there were too many variables involved, and he claimed that their methodology did not allow for measuring individual or even group exposure.

III.    Bifurcated Trial Proposal

Although the plaintiffs maintain that class action is appropriate, they acknowledge that questions of damages would vary among class members. To solve this, they propose a bifurcated trial where fault and causation would be addressed first, with a more individually tailored process for determining damages. Essentially, the questions of causation and fault are fit for the class action format, according to the plaintiffs, while the damages due to the harm that the class members suffered require more individual attention. The latter, damages phase would only occur if Exxon were found liable in the first stage. Exxon opposes this approach, claiming that the plaintiffs are trying to manufacture the elements necessary for a class action where they do not exist.

## **Analysis**

Class certification requires satisfying all elements of Federal Rule of Civil Procedure 23(a) and at least one of the scenarios in Rule 23(b). When a party seeks certification of a class, it must "must affirmatively demonstrative [its] compliance with the Rule . . . ." *Wal-Mart Stores,*

---

[5] The odor threshold is the level of Hydrogen Sulfide in the area before a person can smell it.

*Inc. v. Dukes*, 131 S.Ct 2541, 2551 (2011). The plaintiffs argue that they meet the standards for Rule 23(a) and 23(b)(3): predominance and superiority.

I. Rule 23(a)

Rule 23(a) has four elements:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

When considering whether a case satisfies each element, "questions may be considered to the extent . . . that they are relevant to determining whether the Rule 23 perquisites . . . are satisfied." Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S.Ct 1184, 1195 (2013).

A. Numerosity

The first element requires that the proposed class be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1) (West 2014). To establish this element, plaintiffs "must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *James v. City of Dallas, Tex.*, 254 F.3d 551, 570 (5th Cir. 2001) (Overturned on other grounds). The plaintiffs indicate that their chosen geographic area included over 7,000 residents as of the 2010 census, but the defense counters that the plaintiffs have not made an effort to clarify which of these individuals have experienced any of the physical symptoms or nuisance issues claimed in the suit.

Although the plaintiffs have not ascertained exactly who these individuals are, their models and data, along with public records, have pinpointed a time and area. This means their

number almost certainly meets the numerosity requirement, even if all 7,000 people do not complain of symptoms or allege nuisance-related issues. The exact threshold for numerosity is not easily defined, but if even one-third of the people have complaints, their number certainly satisfies the numerosity requirement. Their complaints may differ in severity and potential cause, affecting their membership in the proposed class, but that is a predominance and/or superiority issue.

## B. Commonality

To establish the second element, the party seeking certification must establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For commonality, that the parties suffered a common injury is important, though this "can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). Significantly, these common questions of law or fact must be "central to the validity of each of the class member's claims." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir 2012). The plaintiffs argue that there are numerous questions of law and fact common to the parties, primarily those concerning causation and fault. For example, they argue that whether refinery leaks caused the purported high levels of hydrogen sulfide[6] and whether Exxon was at fault in those leaks are questions common to all the claims, even if the level of damage and harm caused by the leaks may vary. Exxon claims that because there are three main events, and that these events occurred under different weather conditions, lasted for different amounts of time, and occurred at different times, commonality should fail; Exxon also applies to this logical generally, noting that beyond the three referenced leaks, there are claims for general exposure and regular,

---

[6] These questions are also common for the other chemicals, such as naptha, HCL, and sulfur dioxide.

minor leaks that are also subject to different conditions depending on timing, weather, and, significantly, who among the class members was actually present at the time of exposure.

Exxon has correctly indicated that there are differences among the claims of the proposed class members, but these differences are insufficient to defeat commonality. Among the questions of law and fact common to the parties are factual questions concerning the size, timing, and location of the leaks, as well as questions concerning the ability of the leaks to cause symptoms and/or invoke nuisance concerns. Unlike *Price*, which Exxon cites to support its challenge on this element, the common question asserted to satisfy commonality for this class is not whether Exxon was at fault for the leaks[7] but instead whether these leaks were sufficient to cause symptoms and nuisance issues. That question is the reason the experts plotted exposure data and testified about the threshold regarding hydrogen sulfide, and it is central to each claim, even if damages and other issues may differ among class members. Consequently, the plaintiffs have met their burden regarding Rule 23(a)(2).

### C. Typicality

The next element that the party seeking certification must prove is that "the claims . . . of the representative[s] . . . are typical of the claims . . . of the class. Fed. R. Civ. P. 23(a)(3). Typicality requires that "the class representative's claims have the same essential characteristics of those of the putative class," meaning the claims need to be rooted in similar actions and rely on similar legal theories. *James*, 254 F.3d at 571. According to the plaintiffs, the representatives live and/or own property in the area—at least during the time frame—and, also like the members of the class, have a variety of health complaints and nuisance complaints due to the refinery's

---

[7] This is a common question in this litigation as well, but in *Price*, it was the only common question, and that was insufficient.

leaks and releases. Exxon, however, focuses on the variance in the types of harm, both health-related and property-related, that the proposed class members may have suffered.

According to the plaintiffs, the representatives allege a variety of similar complaints related to physical symptoms—including sinus issues, headaches, and eye irritation—and nuisance issues—including loss of enjoyment of property and malodorous scents. There are some differences among the representatives, but they are thorough and cover both nuisance and physical symptoms. Although the class members, like the representatives, might vary somewhat in their complaints, the essential characteristics of the claims are the same as those of the representatives. Primarily, all must prove what caused their symptoms and nuisance-related complaints, and they all must prove that Exxon is at fault for these symptoms and complaints.

### D. Adequacy

Finally, regarding Rule 23(a), the parties seeking certification must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement considers whether the attorneys are appropriately zealous and competent, whether the representatives are capable of taking an active role in pursuit of the claims, and whether there are any conflicts of interest among class members. *Berger v. Compaq Computer Corp.,* 257 F.3d 475, 479 (5th Cir. 2001). Although Exxon does not challenge the competency of the plaintiffs' lawyers, they reiterate their belief that the claims and damages are different, and they argue that this presents potential conflicts of interests.[8] The plaintiffs note that their lawyers are experienced in class action litigation, that the representatives testified that they would actively participate in the litigation, and that the claims are sufficiently similar to avoid any conflicts of interest.

---

[8] Exxon also raised concerns about the adequacy of Tonga Nolan as a class representative, but that issue is moot after the Court granted the plaintiffs' motion to eliminate her as a representative.

9

As Exxon does not dispute the competency of the plaintiffs' lawyers, and because all representatives testified that they were willing and able to participate in the litigation, the main concern is a potential conflict of interest. Exxon argues that the differences in the claims present a potential conflict of interest, but these differences do not create a zero sum game among class members. Further, given the wide breadth of complaints that the proposed representatives have, from rashes and headaches to inability to hold outdoor gatherings or do yardwork, it is unlikely that a potential complaint of the class is uncovered. The experts did not agree on the reliability of the exposure data or that it showed enough exposure to cause symptoms, but they did not appear to disagree on the possible symptoms from exposure. This indicates that whether class members suffer sinus issues or headaches, rashes or gastrointestinal symptoms, their interests will be covered by the class representatives. Consequently, the proposed class representatives would adequately represent the interests of the class.

II. Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual methods, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This presents a two-step inquiry: first, whether the questions of law or fact common to class members predominate; and second, whether the class action superior to other methods for addressing the controversy.

A. Predominance

Predominance requires that the Court identify "the substantive issues that will control the outcome, assess which issues will predominate, and then determine whether the issues are common to the class." *Madison v. Chalmette Ref., LLC*, 637 F.3d 551, 555 (5th Cir. 2011).

Generally, class actions in mass tort cases are not favored, and certification should only be granted if there are "exceptional features" that justify deviating from the "general rule." *Steering Comm. V. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006). In these instances, there are typically differences regarding damages, liability, and defenses with respect to those individuals affected, and this presents a high likelihood of a class action devolving into numerous individual lawsuits. *Id*. Other cases also indicate similar issues with "air emission mass tort" suits due to "significant disparities . . . in terms of exposure, location, and whether mitigative steps were taken." *Madison*, 637 F.3d at 557. In *Steering* and *Madison*, neither court addressed the effect that bifurcation may have on the predominance factor in a mass tort case; the parties seeking class certification did not propose it. *Id*. at 556–57; *Steering Comm.*, 461 F.3d at 604. In a similar vein, the Louisiana Supreme Court has noted that nuisance claims tend to require individualized evaluation—particularly due to the "mere inconvenience" defense—making class actions disfavored for these claims as well. *Price v. Martin*, 79 So.3d 960, 974 (La. 2011). Bifurcation is also not addressed in *Price*. *Id*.

Several cases, however, have discussed bifurcation in the context of class actions and the predominance issue. These cases agree that bifurcation cannot be used to separate common and divergent issues and create predominance; the case must satisfy predominance as a whole before any severance and trial management tinkering may occur. See, e.g. *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). However, as the plaintiffs point out, courts have used bifurcation in class actions. See, e.g., *In Re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). The plaintiffs argue that they have demonstrated sufficient similarities such that the common issues of law and fact predominate as a whole; these common issues are, according to the plaintiffs, the factual and legal questions concerning Exxon's fault and the effects these leaks

can cause on people and property. They also point to the Deepwater Horizon litigation to support their assertion that a court can use bifurcation to ameliorate concerns about divergent issues of law and fact regarding damages. Exxon argues, however, that this case is similar to mass tort cases where courts rejected certification, and in fact, to the extent that it is different, it differs in a way that more strongly supports denying certification: in the mass tort cases that they cited, there was one event; here, there are at least three major leaks at issue, along with numerous smaller leaks. According to Exxon, bifurcation here is inappropriate, and they distinguish *In Re Deepwater Horizon* on the basis that it was a settlement class action, neutralizing potential issues with differences in questions concerning fault and causation.

The Court finds that there are some common issues of fact among the class members, but the plaintiffs have failed to establish that these questions predominate. As Exxon points out, certification is not favored in mass tort cases, and there are numerous cases rejecting certification with one event; the plaintiffs here seek certification relating to three separate leaks over an extended time period, as well as 145 smaller leaks. Here, there are simply too many variant questions as to each class member for the common issues that do exist to predominate. For example, at least one of the representatives, Gussie Johnson, smokes, so whether the purported leaks cause her symptoms, and to what extent, would be evaluated differently than those in the class who do not smoke and/or do not live with smokers. Questions like this, as well as questions of "location, exposure, dose, [and] susceptibility to illness" undercut the plaintiffs' case for predominance, and given the jurisprudence on mass tort cases rejecting certification with one event, this case, with three events, presents an even wider array of variant questions and issues, and certification is inappropriate. *Steering Comm.*, 461 F.3d at 602.

The plaintiffs suggest that bifurcation can remedy these problems by separating damages from causation and fault, but the variant questions and issues extend well into the issues of fault and causation; this is unlike the *Deepwater Horizon* case, which involved a single event and was a settlement, leaving only damages to be decided. In that case, there were common questions such as "BP's involvement in the well design, explosion, discharge of oil, and cleanup efforts," and, the Fifth Circuit noted, "'virtually every issue prior to damages [was] a common issue.'" *Deepwater Horizon*, 739 F.3d at 816 (quoting *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 298 (5th Cir. 2001)). Here, that is not the case; primarily, the influence of other factors on the alleged injuries varies among the class members. The symptoms of which the representatives complain can be caused by numerous factors, including allergies, other irritants (such as smoking), and illness. Although Exxon's fault in the three major leaks and other actions alleged may be a common question, it does not predominate over the questions of causation and damages together.

### B. Superiority

As the plaintiffs have failed to establish that the common questions of law or fact predominate, it is unnecessary to evaluate whether a class action is superior to other methods for addressing this controversy.

### Conclusion

Although the plaintiffs have satisfied the requirements of Rule 23(a), they have failed to establish those of Rule 23(b). Their proposed class is sufficiently numerous, there are common questions of law or fact among them, the claims of the representatives are typical of those of the class, and the class representatives and their lawyers would adequately represent the interests of the class. However, the common issues of law and fact do not predominate over other questions.

There are at least three major events, along with numerous other, smaller events, and the questions of which class members were present, where within the proposed class area they were present, and for how long they were present would differ among the members of the class, and these questions would affect degree and nature of exposure. Other divergent questions exist as well, such as the role that certain habits, including smoking, have on some of the symptoms that the class members experienced.

For the foregoing reasons, the plaintiffs' Motion to Certify Class (Doc. 124) is DENIED. Signed in Baton Rouge, Louisiana, on May 13, 2015.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**